

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

|  |  |  |
|---|---|---|
| | § | No. 08-21-00012-CV |
| IN RE: | § | Appeal from the |
| THE COMMITMENT OF KEITH SCOTT BROWN | § | 385th Judicial District Court |
| | § | of Midland County, Texas |
| | § | (TC# CV56248) |

**O P I N I O N**

A Midland County jury unanimously found, beyond a reasonable doubt, that appellant Keith Scott Brown is a sexually violent predator. *See* TEX. HEALTH & SAFETY CODE ANN. § 841.003. Accordingly, the trial court ordered Brown committed to supervision and treatment pursuant to Chapter 841 of the Texas Health and Safety Code, titled "Civil Commitment of Sexually Violent Predators" (the SVP Act). *See id*. ch. 841. In two issues, Brown challenges the legal and factual sufficiency of the evidence, as well as the constitutionality of the SVP Act, both facially and as applied to him. We affirm the trial court's judgment and the related order of civil commitment.[1]

---

[1] This case was transferred from the Eleventh Court of Appeals of Texas, our sister court in Eastland (Appellate case No. 11-20-00282-CV), and we decide it in accordance with the precedent of that court to the extent required by TEX. R. APP. P. 41.3.

## I.  BACKGROUND

### A.  Dr. Dunham's expert testimony

Forensic psychologist Dr. Jason Dunham testified as the State's first witness. After detailing his training and experience as a specialist in sex-offender risk assessment, Dr. Dunham described that he met with and conducted an evaluation of Brown for the purpose of determining whether he suffered from a behavioral abnormality that subjected him to civil commitment under the SVP Act. He explained that his assessment of Brown was a type of future-based evaluation, which entailed making a risk assessment of future danger based on past behavior, along with other factors. He also explained that research showed past behavior was the best predictor of future conduct. Dr. Dunham testified he has been conducting evaluations of this nature for the past fifteen years.

Dr. Dunham testified that, as a forensic psychologist—meaning, a psychologist who applies psychology principles to legal questions—he was familiar with the statutory definition of "behavioral abnormality," a legal term. Explaining, Dr. Dunham testified that a behavioral abnormality is a congenital or acquired condition (i.e., a condition one is born with or develops over time) that affects a person's emotional or volitional capacity which, by impairing the person's ability to control their desires, impulses, and even thoughts, predisposes them to (or makes them likely to) commit a predatory act of sexual violence, legally defined as an act for the primary purpose of victimization. Because "likely" is not defined by the SVP Act, in accordance with the literature concerning application of the statute, Dr. Dunham defined it as, "there's a pretty good chance that something is going to happen." In other words, Dr. Dunham explained, a behavioral abnormality is "some type of psychological or even psychiatric condition that puts the person at a certain level of risk that makes them likely to commit a certain type of sexual offense."

### 1. Methodology employed

Since there is no clinical or scientific test that will directly indicate whether someone meets the statutory definition of behavioral abnormality, Dr. Dunham conducted his evaluation of Brown using a "clinically adjusted actuarial approach," a methodology generally accepted in the forensic psychology field. The methodology is named this way because it allows for the clinical adjustment of the overall statistical value of several factors, namely risk factors and protective factors, in arriving at an opinion after synthesizing data from various sources. Dr. Dunham described this methodology as a holistic one, focused not on isolated instances of behavior but on the person's exhibited patterns of behavior during his or her entire lifetime.

In arriving at his opinion that Brown suffered from a behavioral abnormality, Dr. Dunham interviewed Brown and reviewed various documents: reports concerning Brown's criminal history, including police reports and statements made by victims and Brown concerning his prior offenses; prison disciplinary, medical, sex-offender-treatment, and parole records; as well as previous evaluations done by other doctors, Brown's deposition transcript, and education records. Dr. Dunham also employed two testing instruments commonly used by experts in evaluating sex offenders for potential behavioral abnormalities under the SVP Act: (1) the Static-99R, which assesses an offender's risk for being re-convicted of a sex offense; and (2) the Psychopathy Checklist Revised (PCLR), which measures a person's psychopathy along a continuum.

Risk factors, which research shows correlate to sexual-offense recidivism, were also assessed in counterbalance with protective factors, which generally help reduce the risk of recidivism resulting from the presence of these risk factors.

## 2. Brown's sexual criminal history

In 1994, when Brown was seventeen years old, he sexually assaulted six-year-old A.A. Brown had been kicked out of his home and he was staying in Nebraska with A.A. and her family for roughly two weeks before the offense took place. The day of the offense, Brown was babysitting A.A. and her siblings. Thinking they were all asleep, Brown began watching an adult-pornography video. When A.A. came into the room, Brown continued to watch the video and became aroused by her. Brown then took A.A. to the bedroom, dressed her in her mother's lingerie, fondled her vagina, and then licked her vagina while masturbating. Brown admitted to Dr. Dunham that he was sexually aroused by A.A. within the first week of his stay at her family's residence; he remembered seeing her naked in the bathtub and masturbating to thoughts of her before he sexually assaulted her. Brown told Dr. Dunham that he found A.A. very attractive, that, although he was able to resist this attraction to her after he had first given her a bath when he had babysat, he continued to masturbate to thoughts of her until he "couldn't help himself any longer." Brown was convicted of first-degree sexual assault under Nebraska law and sentenced to a prison term of six-and-a-half to twelve years.

In 2022, or roughly two years after his release from prison in Nebraska, Brown sexually assaulted S.B., a ten-year-old autistic child who was intellectually disabled and hardly verbal. Brown became acquainted with S.B. after he and his wife moved to Midland. Brown's wife and S.B.'s mother became best friends and were inseparable. Consequently, Brown and his wife visited S.B.'s home on an almost-daily basis. One day, while in the bathtub, S.B. was able to indicate that Brown had put his finger inside her vagina: she said, "Ke" (which was how she referred to Brown) and pointed to her vagina. When examined by a nurse at the hospital, S.B. put her finger inside her vagina and said, "Ke" again. Brown admitted to police that he put his finger inside S.B.'s vagina,

4

though Brown was inconsistent on whether he did this on one or two occasions, either on the side of the road when taking S.B. for ice cream, or in a vehicle in front of S.B.'s house, or both.

Brown's version to Dr. Dunham was that his wife and S.B.'s mother encouraged him to take S.B. for ice cream, which made him upset because they "put him in a position like that." He pulled over on the side of the road and put his hand down S.B.'s pants and fondled her vagina while masturbating to completion. Brown explained to Dr. Dunham that he became aroused by S.B. over time, thinking about her more and more as time passed. Before assaulting S.B., Brown would fantasize about her, even while having sex with his wife. He indicated his urges escalated to a point where he could no longer resist.

Brown was resentful that his wife would have him go over to S.B.'s house when she suspected that he was sexually attracted to S.B. and knew he was a convicted sex offender. Brown was sentenced to a twenty-year prison term for aggravated sexual assault of a child as a repeat offender.[2]

Dr. Dunham explained Brown's offenses against A.A. and S.B. were clinically violent given the children were unable to consent. Additionally, Brown's sexual-offense convictions were among the enumerated criminal offenses under the SVP Act.

### 3. Brown's nonsexual criminal history

Dr. Dunham testified that Brown had been in trouble with law enforcement from a young age and had been arrested six or seven times by the time he was fifteen years old. Brown began using drugs and alcohol at age ten or eleven, ran away from home, got in trouble for throwing rocks at a teacher, and was convicted of assault at age fifteen. He was sent to a boys' home at age

---

[2] Dr. Dunham testified that there had been an additional allegation against Brown that he had molested his former girlfriend's two-year-old girl within a couple of months after his release from prison in Nebraska. However, no charges were brought against Brown. Thus, because Dr. Dunham could not say whether this assault occurred or not, he did not allocate much weight to this allegation in conducting his risk assessment.

thirteen, at one point running away from there, too. At age seventeen, he was arrested for the unauthorized use of his mother's car and was kicked out of his house as a result. During the two years Brown was free between incarcerations, he reported using methamphetamine, LSD, alcohol, and prescription pills.

### 4. Diagnoses, risk factors, and protective factors

#### a. Diagnoses

Based on these problematic behaviors that Brown engaged in while he was a juvenile, Dr. Dunham diagnosed Brown with a conduct disorder, which in turn, supported a diagnosis of antisocial personality disorder—a congenital or acquired, and chronic, lifelong condition characterized by rule-breaking behavior, or not engaging in normative behavior based on the rules or laws of society, which can affect a person's emotional or volitional capacity. While antisocial personality disorder may manifest differently during a person's lifetime based on his or her setting—such as when he or she is institutionalized—it does not cease simply because the person becomes an adult or is incarcerated. Dr. Dunham explained that his diagnosis of Brown's antisocial personality disorder was supported by Brown's sexual and nonsexual criminal history, and there was evidence that this condition contributed to Brown's threat to the health and safety of others.

Dr. Dunham also diagnosed Brown with "pedophilic disorder nonexclusive type sexually attracted to females," which meant that Brown is sexually attracted to both female children and female adults. Like Brown's antisocial personality disorder, Brown's pedophilic disorder is a lifelong, chronic, and congenital or acquired condition that affects his emotional or volitional capacity. Furthermore, Dr. Dunham opined, this condition would cause Brown to continue to be a menace to the health and safety of another.

6

## b. Risk factors

Dr. Dunham testified that the two biggest risk factor categories are sexual deviance and antisocial orientation, both of which, based on Brown's antisocial-personality-disorder and pedophilic-disorder diagnoses, Brown suffered from. Brown's sexual deviancy was evinced by having engaged in sexual behaviors resulting in his arrest and conviction for those behaviors. Exhibiting, as Brown does, risk factors in both sexual-deviancy and antisocial-personality categories elevates a person's risk of re-offending. Dr. Dunham described Brown's combination of sexual deviancy towards sexual contact with children and antisocial personality disorder as especially dangerous.

Dr. Dunham also attributed Brown's elevated risk of committing a predatory act of sexual violence to the following risk factors: (1) the early onset of his adult sexually violent criminal behavior at the age of 17; (2) the young age of Brown's chosen victims; (3) that Brown's victims were unrelated to him, indicating that the offense was based on sexual deviance rather than emotional connection; (4) Brown's affirmative decision to engage in sexual contact with a child despite having access to consensual sex with an adult (his wife), indicating increased deviancy; (5) Brown's fantasies about S.B. while engaging in sexual intercourse with his wife, also indicative of increased deviancy; and (6) Brown's viewing of child pornography after his release from prison, an "aggravated risk factor" given that he had committed a "contact" sexual offense.

He identified Brown's most significant risk factor as his persistence following punishment, i.e., Brown's commission of a sexually violent offense after his first incarceration. This, Dr. Dunham explained, put Brown within the small percentage of sex offenders who re-offend following punishment, be it by probation or incarceration, and demonstrated Brown's inability to control his urges even after being punished for acting on them. In assessing the similarities between

his two offenses, Dr. Dunham identified a repeated pattern of behavior comprised of three stages: (A) fantasizing (including masturbation) about the victim; (B) the act of committing the sexual assault on the victim; and (C) incarceration for the offense. Dr. Dunham considered the repetition of this "ABC" cycle over an eight-year period a risk factor.

Dr. Dunham explained that while Brown, having admitted he is still currently aroused by children, had not admitted to currently engaging in fantasies about children, this was likely due to his incarceration for the past seventeen years, which meant he has not been around children. In effect, Dr. Dunham opined that Brown's past pattern of behavior showed he would, once more, begin fantasizing about the next child he has contact with.

Dr. Dunham explained that Brown's institutional adjustment was fair but worse than that of the typical pedophile.[3] However, this was more descriptive of his antisocial personality disorder rather than a separate risk factor, in and of itself. Dr. Dunham testified that Brown had a hard upbringing and was himself a victim of sexual abuse as a child; however, being a victim of sexual abuse did not correlate to an elevated risk for commission of a sex offense, as most victims of sexual abuse do not go on to abuse others. He likewise did not categorize Brown's lifestyle instability (his substance-abuse problem and lack of employable skills or support system outside of prison) as a risk factor, nor did he contribute Brown's sexual assault of S.B. to his use of methamphetamine at the time.

### c. Positive considerations and protective factors

Dr. Dunham identified some "positive" factors in favor of Brown—that he acknowledged his sexual deviancy, generally admitted his offenses, completed institutional sexual-assault-

---

[3] Brown received disciplinary citations for sexual misconduct after having sex with another inmate and for kicking a door. Dr. Dunham explained it was rare to find a child molester who experienced problems outside of their sexual deviancy towards children and that child molesters were typically model prisoners.

awareness, received job training, participated in the prison's AA/NA meetings, and finished his high school diploma—but explained that, while these considerations may generally aid Brown in succeeding in the future, they did not rise to the level of "protective" factors that reduced the risk of him committing a sexually violent offense in the future. Notably, because the prison's sex-offender-treatment program was one that was merely education-based,[4] Dr. Dunham opined that Brown remaining in compliance with this program was insufficient to impact his chances of re-offending.

And while Brown did have remorse and empathy for his victims, which is generally considered a "protective" factor, Dr. Dunham noted the factor's diminished role in reducing the relevant risk of reoffending given that Brown had expressed remorse and empathy for his first victim, and yet, he re-offended against a second victim. That Brown appeared to understand his risk of re-offending was also a protective factor, as was the fact that he was now older.

### d. Psychological assessment tools

As previously discussed, there is no testing that exists to determine a behavioral abnormality because it is strictly a legal term. Different assessment tools consider different risk factors, but no test considers them all. As such, the assessment-tool scores should be clinically adjusted in order to more accurately reflect the subject's risk for re-offending.

Brown scored a 21.1 on the PCLR, which measures a person's degree of psychopathy along a continuum. Although Brown may not be a prototypical psychopath, a typical pedophile generally scores in the lower range. A person's degree of psychopathy is relevant in determinations of behavioral abnormalities because psychopathy combined with sexual deviancy is known to be a very dangerous combination for sexual recidivism.

---

[4] For instance, Brown's sex-offender-treatment classes had not yet addressed the cause of his sexual criminal history.

Under the Static-99R, which measures a person's risk of being re-convicted of a sex offense within a certain number of years based on "static" factors (or risk factors that generally do not change over time), Brown scored a three, which placed Brown at an average risk of being re-convicted of a sex offense. Based on the test's failure to consider several relevant factors, however, Dr. Dunham opined that this score was an underestimation of Brown's risk for sexual-offense recidivism; indeed, his score would have been the same before he committed the second offense against S.B.

Overall, Dr. Dunham opined that Brown was at a moderate-high risk for re-offending and suffered from a behavioral abnormality that makes him likely to engage in a predatory act of sexual violence under the SVP Act.

## B. Brown's testimony

At trial, Brown (then forty-three years old) testified regarding his criminal history, including his convictions for sexually assaulting A.A. and S.B., as well as his various other crimes to include, among others, an arrest for shoplifting when he was eight years old, a juvenile commitment for misdemeanor assault, and an incident wherein he attacked his mother's boyfriend with a knife. Brown had been sexually abused as a child by his grandfather, mother, and his mother's boyfriend and was in and out of foster care before being placed in a boys' home at age thirteen.

Regarding his commission of the sexual offenses against A.A., Brown testified that he became attracted to her over time, began fantasizing about her a few days before he assaulted her, and masturbated to thoughts of her naked body. Brown agreed that he had tried to resist his urges but eventually could no longer resist them. Brown initially denied that he noticed an attraction to

10

A.A. within a week of arriving at A.A.'s house, but later, when confronted with his statement to Dr. Dunham on this issue, he admitted that the attraction began early on.

Brown related that he was masturbating to a pornographic video when A.A. came into the room and sat on his lap. A few minutes later, he dressed her in her mother's lingerie, which he had found lying in the hamper. When asked why he did that, Brown replied, "I don't know. Maybe it was a stupid mistake." Brown then undressed himself and told A.A. to watch him, after which he performed oral sex on her while masturbating and then ejaculating.

Brown stated he eventually pleaded guilty to first-degree sexual assault after his first offense because he believed he needed to go to jail. While he was remorseful and never wanted to assault a child again, he acknowledged his remorse alone did not stop him from doing so roughly eighteen months after his release from prison. Even so, Brown continued to say he was sorry for having assaulted A.A. and S.B.

Brown related that he met S.B. about a week after his release from prison in Nebraska, and about fourteen months later, he noticed he was attracted to her. Due to this attraction, Brown tried to make excuses to avoid visiting her home. One day, after S.B. missed the ice cream truck, at the urging of his wife and S.B.'s mother, Brown took S.B. for ice cream. On the way back, Brown pulled over, put his hand down S.B.'s pants, fondled her vagina, masturbated, and ejaculated.

Brown stated he did not remember telling Dr. Dunham that he fantasized about S.B. before assaulting her or that he had done so while having sex with his wife. Brown also contradicted his earlier testimony about how long he had been attracted to S.B., this time stating it began only three or four weeks before the assault. Brown first blamed his going over to S.B.'s house on his wife's inability to drive. Ultimately, however, he admitted he did not necessarily have to stay at the house with her. When asked if he sexually assaulted S.B. to gratify his own sexual desires, Brown stated

11

he "guess[ed] you [could] call it that" and that he did not know why he assaulted S.B. Overall, Brown indicated his resentment toward his wife and S.B.'s mother for encouraging him to spend time with S.B.: he felt they "threw" S.B. at him, explaining, "Why would you sit there and send a 10-year-old child to a store with a convicted sex offender? Hmm." When asked if it was the responsibility of S.B.'s mother and Brown's wife to make sure he did not assault S.B., Brown stated that "[t]hey knew what [he] was convicted of" but that he could not answer that question. As to A.A., Brown indicated he felt she needed to tell him "no."

Between incarcerations, Brown held a slew of jobs, including working as a cashier, an assistant manager, a stock clerk, a mover, and a junk-yard worker. During the six months leading up to his sexual assault of S.B., Brown was using methamphetamine almost daily, along with marijuana, Lortab, Xanax, and alcohol. Brown testified he was a social drinker and drug-user but would attend AA/NA meetings when released from prison. Although he admitted AA/NA classes were "not enough for him," he did not believe he had a substance-abuse problem because he was sober during the last eighteen years he had spent in prison.

Brown also testified that he was half-way through a nine-month-long sex-offender-treatment program and he was no longer attracted to young girls. He acknowledged he needed sex offender treatment to address his problem. Asked to describe the problem, he answered, "I've been convicted twice of first-degree sexual assault." After his first sexual offense, he did not believe he had a problem per se and thought he had it managed. While the classes helped him recognize he had several "thinking errors," he was unable to recall what they were. He was unable to answer why he sexually assaulted A.A. or S.B., but stated he now knew that what he did to A.A. and S.B. was wrong. He also testified that a prison ministry enabled him to be baptized and attend worship services, which made him want to be a different person. Brown asserted he would not re-offend

and that he might have been able to control his urges toward A.A. and S.B. if he had received intense therapy at the time.

The jury returned a unanimous verdict finding Brown a sexually violent predator beyond a reasonable doubt, and the trial court entered a judgment and order civilly committing Brown pursuant to the SVP Act. This appeal followed.

## II. SUFFICIENCY OF THE EVIDENCE

In his first issue, Brown challenges the legal and factual sufficiency of the evidence to support a finding that he meets the definition of "behavioral abnormality."

### A. Standard of review

As the Supreme Court of Texas recently described, "[a] commitment proceeding under the SVP Act is the unusual civil case incorporating the 'beyond a reasonable doubt' burden of proof typically reserved for criminal cases." *In re Commitment of Stoddard*, 619 S.W.3d 665, 674 (Tex. 2020); *see also In re Commitment of Fisher*, 164 S.W.3d 637, 639-41 (Tex. 2005). And thus, this elevated burden of proof necessarily affects the appellate review of the evidence. *Stoddard*, 619 S.W.3d at 674. Accordingly, in SVP cases, we review the legal sufficiency of the evidence using the appellate standard of review for criminal cases. *Stoddard*, 619 S.W.3d at 675 (describing the legal sufficiency standard in a criminal case: "the reviewing court must determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979))); *In re Commitment of Harris*, 541 S.W.3d 322, 327 (Tex. App.—Houston [14th Dist.] 2017, no pet).

Under this standard, it is the fact finder's responsibility to fairly resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts.

*See In re Commitment of Williams*, 539 S.W.3d 429, 437 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *In re Commitment of Mullens*, 92 S.W.3d 881, 887 (Tex. App.—Beaumont 2002, pet. denied). Essentially, an appellant must demonstrate that no evidence supports the jury's finding to prevail on a legal-sufficiency challenge to the evidence. *In re Commitment of Cordova*, 618 S.W.3d 904, 915 (Tex. App.—El Paso 2021, no pet.); *In re Commitment of H.L.T.*, 549 S.W.3d 656, 661 (Tex. App.—Waco 2017, pet. denied).

Additionally, *Stoddard* also clarified the factual-sufficiency standard governing an appellate challenge of the evidence supporting an individual's commitment under the SVP Act. *Stoddard*, 619 S.W.3d at 668. The Supreme Court held that, "a properly conducted factual-sufficiency review in an SVP case requires the court of appeals to determine whether, on the entire record, a reasonable factfinder could find beyond a reasonable doubt that the defendant is an SVP." *Id.* When doing so, "the appellate court may not usurp the jury's role of determining the credibility of witnesses and the weight to be given their testimony, and the court must presume that the factfinder resolved disputed evidence in favor the finding if a reasonable factfinder could do so." *Id.* And lastly, "[i]f the remaining evidence contrary to the finding is so significant in light of the entire record that the factfinder could not have determined beyond a reasonable doubt that its finding was true, the evidence is factually insufficient to support the verdict." *Id.*

## B. The applicable law

To establish that an individual is an SVP, the State must prove that the individual: "(1) is a repeat sexually violent offender; and (2) suffers from a behavioral abnormality that makes the person likely to engage in a predatory act of sexual violence." TEX. HEALTH & SAFETY CODE ANN. § 841.003(a); *see also Stoddard*, 619 S.W.3d at 676. Under the first element of the SVP statute, a person is a "repeat sexually violent offender . . . if the person is convicted of more than one sexually

14

violent offense and a sentence is imposed for at least one of the offenses . . . ." *Id.* § 841.003(b).

And as relevant here, sexual assault and aggravated sexual assault are sexually violent offenses. *Id.* § 841.002(8)(A); *see also* TEX. PENAL CODE ANN. §§ 22.011, 22.021.[5] Under the second element of the SVP statute, a "'[b]ehavioral abnormality' means a congenital or acquired condition that, by affecting a person's emotional or volitional capacity, predisposes the person to commit a sexually violent offense, to the extent that the person becomes a menace to the health and safety of another person." TEX. HEALTH & SAFETY CODE ANN. § 841.002(2). The State bears the burden of proving both elements beyond a reasonable doubt. *Id.* § 841.062. Here, however, Brown complains only that the evidence is insufficient to support the beyond-a-reasonable-doubt finding that he suffers from the requisite behavioral abnormality.

## C. Application

### 1. Legal sufficiency of the evidence

Specifically, Brown frames the sufficiency issue by asking the following question: "Is the evidence legally and factually insufficient to support a beyond-a-reasonable-doubt finding that Mr. Brown meets the legislatively intended definition of 'behavioral abnormality?'" We note that in enacting the SVP Act, the legislature included the following legislative findings:

> "[T]hat a small but extremely dangerous group of sexually violent predators exists and that those predators have a behavioral abnormality that is not amenable to traditional mental illness treatment modalities and that makes the predators likely to engage in repeated predatory acts of sexual violence . . . . Thus, the legislature finds that a civil commitment procedure for the long-term supervision and treatment of sexually violent predators is necessary and in the interest of the state."

TEX. HEALTH & SAFETY CODE ANN. § 841.001; *see also In re Commitment of Fisher*, 164 S.W.3d 637, 639-40 (Tex. 2005). Based on this statutory language, Brown contends we must construe

---

[5] As it was at trial, it is uncontested on appeal that Brown is a repeat sexually violent predator under the first element of the SVP statute.

"behavioral abnormality" to require a finding that Brown is the type of "extremely dangerous sex offender to whom [the SVP Act] was meant to apply." Moreover, he claims the statutory definition of behavioral abnormality necessarily requires us to construe terms such as "likelihood" or "likely to offend," and these terms are susceptible to different meanings unless construed consistent with Chapter 841's legislative history. In this regard, he urges that the legislative findings in the SVP Act command the State to prove, and the jury to find, that he is part of "a small group of 'extremely dangerous' sex offenders."

The State responds that legislative findings are not part of what the State had to prove and they are not what the jury had to find to establish legally sufficient evidence of a behavioral abnormality under the SVP statute. More specifically, the State contends that—whether the evidence is legally sufficient to meet Brown's desired, unenacted statutory definition—is not only irrelevant, but such contention has been squarely rejected as a basis for reversal by the Supreme Court and other Texas appellate courts.[6] Moreover, the State asserts that Brown fails to challenge the sufficiency of the evidence to meet the behavioral-abnormality element of the SVP statute because, rather than challenge the sufficiency of the evidence under the statutory definition of this element, he solely attacks matters the State was not required to prove. We agree.

Courts have uniformly rejected attempts by appellants to incorporate additional sub-requirements into the elements of the SVP Act. *See, e.g.*, *Stoddard*, 619 S.W.3d at 677; *Williams*, 539 S.W.3d at 438-39; *In re Commitment of Hall*, No. 09-09-00387-CV, 2010 WL 3910365, at

---

[6] In response to the State's arguments, Brown contends that his claim is distinguishable from the previously rejected arguments cited by the State because his is an issue of statutory construction within a legal- and factual-sufficiency challenge. This is a distinction without a difference. Whether couched in a statutory-construction issue (where "behavioral abnormality" is construed to *include* the legislative-findings element that persons subject to SVP confinement be part of the "small but extremely dangerous group of sexually violent predators") or a traditional sufficiency challenge (where the "small but extremely dangerous group of sexually violent predators" is *added* as a statutory element of the SVP statute), the effect is the same. That is, one way or another, Brown would have us hold that the State was required to prove that he was part of the "small but extremely dangerous group of sexually violent predators" referenced in the SVP Act's legislative findings. For the reasons discussed below, we decline to do so.

*2-3 (Tex. App.—Beaumont Oct. 7, 2010, no pet.) (mem. op.). Indeed, Brown readily acknowledged in his briefing that *Stoddard* rejected the same argument he posits here. In substance, Brown recognizes that *Stoddard* noted that the legislative findings included in the SVP Act have nothing to do with how Chapter 841's "behavioral abnormality" definition should be construed because the findings "[are] not part of the statute's definition of 'sexually violent predator,' and thus, not an element the jury was required to find." *See Stoddard*, 619 S.W.3d at 677 ("This 'small but extremely dangerous group' language, contained in the Act's legislative findings, is not part of the statute's definition of 'sexually violent predator' and was not an element the jury was required to find."). In openly quarreling with *Stoddard*, Brown urges, however, that we must "derive legislative intent from the statute as a whole (which would include any legislative findings) and not from provisions in isolation." We disagree.

Rather, we must assess the sufficiency of the evidence against the jury charge when, as here, there is no objection or appellate challenge to the charge. *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 221 (Tex. 2005); *see also In re Commitment of Tryon*, No. 11-20-00267-CV, 2022 WL 3649375, at *6 (Tex. App.—Eastland Aug. 25, 2022, no pet. h.) (holding that the starting point of a sufficiency review is the trial court's charge and accompanying instruction (citing *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 762 (Tex. 2003))). Here, the jury charge made no mention or reference to the legislative-findings language forming the basis of Brown's arguments, such as by including the terms "small group," "extremely dangerous," or "traditional treatment modalities." Brown neither requested the above language—or any part of the now-urged legislative-findings language—be included in the charge, and consequently, the jury was not asked to answer any question in this regard. Thus, because Brown fails to contest the sufficiency of the evidence to support the jury's "behavioral abnormality" finding pursuant to the jury charge

17

provided in this case (which only included the proper statutory definitions under the SVP statute), he does not present a sufficiency challenge addressing the statutory definition of behavioral abnormality which the State had to prove.

But even assuming Brown has properly presented a legal-sufficiency challenge for our review, we hold the evidence is legally sufficient to support the jury's verdict that Brown suffers from a behavioral abnormality as required by the SVP statute. To be sure, it is now well-settled that the State is not required to prove that an SVP is part of a "small but extremely dangerous group . . . not amenable to traditional mental health treatment modalities," and we decline Brown's invitation to hold otherwise. *See, e.g.*, *Stoddard*, 619 S.W.3d at 669; *In re Commitment of Stratton*, 637 S.W.3d 870, 887 (Tex. App.—Eastland 2021, no pet.) (holding legislative findings are irrelevant and not part of the statutory requirements for committing an SVP under the SVP Act); *see also Tryon*, 2022 WL 3649375 at *7 (noting *Stoddard*'s explicit holding that the SVP Act's legislative findings are not part of the statute's definition of "sexually violent predator" and thus are not an element the jury must consider or find); *In re Commitment of Gunter*, No. 11-20-00253-CV, 2022 WL 3902735, at *5 (Tex. App.—Eastland, Aug. 31, 2022, no pet. h.) (mem. op.) (noting *Stoddard*'s rejection of similar argument and rejecting appellant's claim that the evidence was insufficient to prove appellant's membership in "a small but extremely dangerous group of sexually violent predators" mentioned in the SVP Act's legislative findings).

Turning to the proper legal-sufficiency standard applicable here, Dr. Dunham testified that, based on his holistic evaluation of Brown—and based on methodologies accepted in his field of expertise—it was his opinion that Brown suffered from a congenital or acquired condition that affected his emotional or volitional capacity, predisposing him to commit a sexually violent offense, to the extent that he was a menace to the health and safety of another. His testimony was

18

consistent with the legal definition of behavioral abnormality. *See* TEX. HEALTH & SAFETY CODE ANN. § 841.002(2). After detailing his training and experience, Dr. Dunham described his careful consideration of various research-based factors in arriving at his opinion, setting out for the jury the precise factual underpinning of his assessment, including consideration of Brown's positive and protective factors, as well as various aspects indicating the non-presence of additional risk factors. Likewise, Dr. Dunham explained his clinical adjustment of the Static-99 and PCLR scores, a practice both well-accepted in the forensic psychology community and founded on extensive factual support.

Brown has not demonstrated that no evidence supports the jury's verdict that he suffers from a behavioral abnormality. *See H.L.T.*, 549 S.W.3d at 661; *Soto*, 2014 WL 887142 at *1. We find that Dr. Dunham's opinion that Brown suffered from a behavioral abnormality was amply supported with underlying bases and, viewing the evidence in the light most favorable to the verdict, we hold that a rational fact finder could have found, beyond a reasonable doubt, that Brown suffered from a behavioral abnormality under the SVP Act. *See Stoddard*, 619 S.W.3d at 675; *Williams*, 539 S.W.3d at 437; *Wirtz*, 451 S.W.3d at 464.

We thus overrule this part of Brown's first issue.

### 2. The evidence is factually sufficient

As noted above, Brown attacks the factual sufficiency of the evidence supporting the jury's behavioral abnormality finding, contending only that it fails to show he is a member of a "small but extremely dangerous group of sexually violent predators."

As discussed in our background recitation of the facts and in our legal-sufficiency analysis above, the State presented ample evidence supporting its expert's ultimate conclusion on the behavioral-abnormality element. As for the factual sufficiency challenge, the standard of review

19

differs in that such review "is premised on consideration of the entire record." *Stoddard*, 619 S.W.3d at 674. As in a legal sufficiency review, we assume that the fact finder resolved disputed evidence in favor of the finding if a reasonable fact finder could do so. *Id.* However, disputed evidence that a reasonable fact finder could not have credited in favor of the finding is treated differently in a factual sufficiency analysis; in a factual sufficiency review, the court considers whether that evidence, in light of the entire record, is so significant that the fact finder could not have determined beyond a reasonable doubt that the statutory elements were met. *In re Commitment of White*, No. 11-20-00038-CV, 2021 WL 5934674, at *5 (Tex. App.—Eastland Dec. 16, 2021, no pet.) (citing *Stoddard*, 619 S.W.3d at 674-75).

While Brown's testimony served to contradict some of the factual underpinnings of Dr. Dunham's expert testimony—for instance, by denying admissions he reportedly made to Dr. Dunham regarding the frequency or extent of his sexual fantasies leading up to his offenses, his disputing the early onset of his attraction to his victims after meeting them, stating he was sorry for the harm he caused his victims (while at the same time shifting blame to his wife and S.B.'s mother for his inability to resist sexually assaulting S.B.), and claiming he would attend AA/NA meetings (but acknowledging the meetings would not sufficiently aid him while also adhering to his claim that he only used drugs and alcohol socially) the jury was free to disregard Brown's internally inconsistent testimony as self-serving, not credible, or both. *See In re Commitment of White*, No. 14-17-00115-CV, 2018 WL 344063, at *8 (Tex. App.—Houston [14th Dist.] Jan. 9, 2018, no pet.) (mem. op.) (holding the jury could have considered appellant's inconsistent statements regarding whether he was aroused while committing the offenses when evaluating his credibility about his acceptance of his problem and intentions not to re-offend in the future).

Further, given Brown's inability to explain why he sexually assaulted A.A. and S.B., his minimization of his sexual attraction to his victims, his attempts to shift the blame for him having sexually assaulted S.B., and the educational (versus therapeutic) nature of his current sex-offender treatment, we find the undisputed evidence that Brown did not intend to re-offend and wanted to attend proper sex-offender treatment is not so significant in light of the entire record such that the jury could not have determined beyond a reasonable doubt that its finding of behavioral abnormality was true. *Stoddard*, 619 S.W.3d at 675, 678.

Viewing the entire record and applying the relevant factual sufficiency standard, we conclude that a rational jury could have found beyond a reasonable doubt that Brown has a behavioral abnormality as required by Chapter 841 and is a sexually violent predator. Accordingly, we hold the evidence is factually sufficient to support the jury's verdict.

We overrule the remaining part of his first issue.

### III. THE CONSTITUTIONALITY OF THE SVP ACT

In his second issue, Brown contends the SVP Act is unconstitutional, on its face and as applied to him, because it allows his commitment based only on some likelihood that he might commit a sexually violent offense in the future.

#### A. Standard of review

When reviewing the constitutionality of a statute, we presume the statute is valid, and that the legislature was neither unreasonable nor arbitrary in enacting it. TEX. GOV'T CODE ANN. § 311.021; *Tenet Hosps. Ltd. v. Rivera*, 445 S.W.3d 698, 701 (Tex. 2014). To prevail on a facial challenge, Brown bears the heavy burden of showing that the SVP Act, by its terms, operates unconstitutionally in every possible application. *Tenet Hosps. Ltd.*, 445 S.W.3d at 702 (citing *United States v. Salerno*, 481 U.S. 739, 745 (1987)); *Fisher*, 164 S.W.3d at 655 (citing *Vill. of*

*Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494-95 (1982)). An as-applied

challenge asserts that a statute, while generally constitutional, operates unconstitutionally as to the

specific claimant who raises the issue because of his particular circumstances. *Tenet Hosps. Ltd.*,

445 S.W.3d at 702 (citing *City of Corpus Christi v. Pub. Util. Comm'n of Texas*, 51 S.W.3d 231,

240 (Tex. 2001)).

## B. Applicable law

The United States Supreme Court has held that civil-commitment statutes, like the SVP

Act, do not violate a person's constitutional due-process rights if the challenged statute requires

proof of at least two elements: "proof of dangerousness" and "proof of some additional factor,

such as a 'mental illness' or 'mental abnormality.'" *Kansas v. Hendricks*, 521 U.S. 346, 358

(1997); *see also Kansas v. Crane*, 534 U.S. 407, 410-14 (2002).

In *Stoddard*, the Supreme Court of Texas reversed the Fort Worth Court of Appeals'

construction of the SVP Act, which had effectively incorporated language exceeding the scope of

the statutory definition of "sexually violent predator." *See Stoddard*, 619 S.W.3d at 677. There,

the Supreme Court noted that the court of appeals had anchored its sufficiency review in the

legislative-findings language, describing a "small but extremely dangerous group," the same

language Brown argues here, out of an expressed concern that a failure to consider the SVP Act's

application to a "small group" of sex offenders "risk[ed] ripping [the SVP Act] from its

constitutional foundation, thus opening the door to civil commitments [under the SVP Act] of sex

offenders based solely on their predicate sex offenses." *Id.* at 678. The Court then expressly stated

this concern was "unfounded because the [SVP Act] inherently limits the scope of civil

commitment to a limited subset of offenders: those who committed certain enumerated sexually

violent offenses, are repeat offenders, and suffer from a behavioral abnormality that makes them

likely to engage in a predatory act of sexual violence." *Id.* Concluding, the Court noted, "the [SVP] Act requires evidence of both repeat past sexually violent behavior and a present condition that creates a likelihood of such conduct in the future. A factual-sufficiency review focused on the [SVP] Act's actual requirements does not threaten its constitutionality." *Id.* (citing *Hendricks*, 521 U.S. at 358).

## C. Application

Brown argues that applying the statutory definition of "behavioral abnormality" would necessarily mean that any person that meets the first element of the SVP statute (that he or she is a repeat sexually violent offender) "would always have at least some 'likelihood' of offending[,] making this element dispositive of whether the person is a[n] [SVP]." But we conclude all of Brown's arguments are predicated on his misinterpretation of the requirements of the SVP Act.

Brown presents the same construction of the SVP Act that the Supreme Court of Texas rejected in *Stoddard.* According to him, the *Stoddard* court's construction of the SVP Act—that is, that the statutory language defining "sexually violent predator" is all the State is required to prove—"uncouples" the two elements required by *Hendricks* and *Crane* to protect the due-process rights of persons subject to SVP confinement under the SVP Act. This is so, he claims, because the SVP Act's definition of behavioral abnormality requires only that the abnormality renders a person "likely" to re-offend or creates a "likelihood" of such conduct in the future. In essence, Brown argues that this "likely" or "likelihood" language sets too low of a bar because any person whose past conduct meets the first element of the statute, *i.e.*, whether one is a "repeat sexually violent offender," is inevitably "likely" to re-offend and therefore automatically meets the second element, *i.e.*, whether one has a "behavioral abnormality." Brown then concludes that, because this effectively folds the second element into the first, the bare definitional language of the SVP Act

23

fails to meet the due-process standards promulgated by the Supreme Court in *Crane* and *Hendricks.*

Thus, Brown contends, to avoid violating the due-process rights of persons who have been committed under the SVP Act, we must incorporate as interpretive guidance the language of the SVP Act's legislative findings into the definition of "sexually violent predator." Such a construction would clearly limit the SVP Act's applicability to only the "small but extremely dangerous group of sexually violent predators" who have a behavioral abnormality "that is not amenable to traditional mental illness treatment modalities," a construction of the SVP Act the *Stoddard* court refused to sanction. *See Stoddard*, 619 S.W.3d at 678.

But Brown misconstrues the holding in *Stoddard.* There, the Supreme Court explained the SVP Act "inherently limits the scope of civil commitment to a limited subset of offenders: those who committed certain enumerated sexually violent offenses, are repeat offenders, and suffer from a behavioral abnormality that makes them likely to engage in a predatory act of sexual violence." *Id.* Evidence of both elements is required for commitment under the SVP Act. *Id.*; *see also Tryon*, 2022 WL 3649375, at *6 (finding the two elements are "not inexorably linked such that they must blend into each other."). As our sister court of appeals in Eastland noted, "the [SVP] Act also covers circumstances in which a person's repeat past sexually violent behavior was not caused by and is not related to his present behavioral abnormality." *Tryon*, 2022 WL 3649375 at *6 (noting the SVP Act defines "behavioral abnormality" as a "congenital *or acquired* condition" (citing TEX. HEALTH & SAFETY CODE ANN. § 841.002(2))).

In sum, Brown's constitutional challenge to the SVP Act is predicated on his misinterpretation—or disapproval—of the holding in *Stoddard*, urging that failing to incorporate the legislative-findings language into the definition of "behavioral abnormality" (as we must)

renders the SVP Act unconstitutional. But *Stoddard* has clearly foreclosed the argument and interpretation of the statutory language that Brown advances, and we are bound to follow the Supreme Court's precedent and the precedent of the transferor court. *See Stoddard*, 619 S.W.3d at 678; *see also Tryon*, 2022 WL3649375 at *9 (overruling facial and as-applied challenges to the constitutionality of the SVP Act predicated on virtually identical arguments as Brown's); *see also* TEX. R. APP. P. 41.3.

We overrule Brown's second issue.

## CONCLUSION

Having overruled Brown's two issues, we affirm the trial court's judgment and order of commitment.


GINA M. PALAFOX, Justice

October 20, 2022

Before Rodriguez, C.J., Palafox, and Alley, JJ.